# Office of Disciplinary Counsel v. Frankel

Disciplinary Board Docket no. 155 D.B. 2001, 94 D.B. 2002.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

BROWN, *Member,* March 12, 2004—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 3, 2001, petitioner, Office of Disciplinary Counsel, filed a petition for discipline at no. 155 D.B. 2001 against respondent, Mark David Frankel. The petition charged respondent with violations of the Rules of Professional Conduct in two separate matters based on allegations that he engaged in inappropriate physical contact with two clients. On July 31, 2002, petitioner filed a second petition for discipline against respondent, charging him with professional misconduct arising from allegations that he engaged in inappropriate conduct with a client. These petitions for discipline were consolidated for hearing by order of the Disciplinary Board dated September 6, 2002.[1]

The consolidated petitions were referred to Hearing Committee 3.05 comprised of Chair John W. Frommer III, Esquire, and Members Henry Amos Goodall Jr., Es-

---

1. As to the complaint by DD against respondent contained in the petition for discipline filed at no. 155 D.B. 2001, the Hearing Committee found the testimony of DD and CC, his mother, to be not credible. The committee dismissed the charges against respondent in the DD matter. The board agrees that the record does not support a finding that respondent committed misconduct in the DD matter.

quire and Anne C. Shapiro, Esquire. A pre-hearing conference was held on February 25, 2002. Petitioner filed a memorandum of law in support of admissibility of petitioner's evidence in order for the Hearing Committee to determine whether 10 witnesses would be permitted to testify as to other incidents of sexual misconduct that would establish that respondent engaged in a common plan or scheme under Pa.R.D.E. 404(b)(2). Petitioner also intended to present three witnesses to show respondent's motive in committing these acts. Respondent filed a motion in limine to exclude the 13 witnesses. On April 5, 2002, the Hearing Committee denied respondent's motion in limine and agreed to permit petitioner's common plan or scheme evidence. The Hearing Committee did exclude the testimony of three of the 13 common plan or scheme witnesses, concluding that their testimony went to propensity and not motive. On April 30, 2002, respondent filed a petition for review of the Hearing Committee's ruling to the Disciplinary Board. Petitioner responded to that motion on May 7, 2002. The board denied respondent's petition for review on June 21, 2002.

Hearings were held in this matter on October 15, October 16, October 26, December 12, and December 13, 2002, and January 13, January 14, January 16, and January 17, 2003. Respondent was represented by Joshua D. Lock, Esquire and Albert G. Blakey, Esquire. Petitioner called 34 witnesses in its case in chief and entered 74 exhibits. Respondent called 22 witnesses and entered 56 exhibits. Respondent called six character witnesses.

Following submission of briefs by the parties, the Hearing Committee filed a report on November 19, 2003, and recommended that respondent be disbarred.

Respondent filed a brief on exceptions and request for oral argument on December 9, 2003. Petitioner filed a brief opposing exceptions on December 17, 2003.

Oral argument was held on January 8, 2004, before a three-member panel of the Disciplinary Board chaired by Laurence H. Brown, Esquire, with Members Marc S. Raspanti, Esquire, and C. Eugene McLaughlin.

This matter was adjudicated by the Disciplinary Board at the meeting of January 14, 2004.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, PA 17101, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born in 1948 and was admitted to practice law in the Commonwealth of Pennsylvania in 1973. He maintains his office at 14 West King Street, York, Pennsylvania 17401. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) Respondent has no prior history of discipline.

(4) Respondent graduated from college in 1970 (NT 1407), graduated from law school in 1973 (NT 1408), and was admitted to the bar in September 1973. (NT 1408.)

(5) Respondent was initially employed as an assistant attorney general for the Commonwealth of Pennsylvania until July 1977 when he entered private practice. (NT 1408.)

(6) Respondent has practiced in York County and the surrounding counties since July 1977 and now maintains several satellite offices, including one in New Oxford that was opened in 1976 (NT 1409) and is principally staffed by respondent, who goes there Wednesday evenings and Saturday mornings. (NT 1410.)

(7) Respondent estimates that he has seen approximately 10,000 clients at the New Oxford office since it opened (NT 1411), and that he has seen approximately 25,000-30,000 clients at his York offices. (NT 1411.)

(8) In more recent years, respondent has become a public figure as a result of extensive advertising, which includes the back of the local telephone books, with the slogan "TTBO," which stands for "turn the book over," and extensive advertising on television, radio and billboards. (NT 1412, 1413.) He estimates that he spends $87,000 annually on radio alone. (NT 1414.)

(9) In the 29 years since he was admitted to the bar, the Office of the Disciplinary Counsel (ODC) has never filed a complaint against him (NT 1414), and his only contact with the ODC has been one telephone call for an issue readily resolved. (NT 1415.)

(10) Frankel has been married to Chris Frankel for 25 years, and during that course of time they have lived together in the York community. (NT 1416.) They have two children and a child from Mrs. Frankel's first marriage, who respondent has adopted and educated. (NT 1417.)

(11) Aside from traffic offenses, respondent has never been charged by the police for any misconduct or questioned by the police for any alleged misconduct. (NT 1416.)

(12) In September 1998, Attorney LLL, a York attorney, filed a complaint for monetary damages against respondent for allegedly groping a Mrs. BBB in a bar in York (NT 1432, 1433) in the presence of Mrs. BBB's husband who was a well-known York radio personality (NT 1431) and their son. Mrs. BBB was then in her seventies. (NT 1433.)

(13) The contentions in the Mrs. BBB case generated a great deal of publicity in York and its surrounding counties. (NT 1434; RX-2.)

*The AA Matter*

Testimony of AA:

(14) Respondent was retained by complainant, AA, sometime between April and July 1999, to represent him on a personal injury case. (NT 38.)

(15) At the time that respondent began representing Mr. AA, Mr. AA had completed high school, and had been in the Goals program, a special education program for people who were slower at learning. Mr. AA had been held back in third grade. (NT 36.)

(16) During one of Mr. AA's initial appointments with respondent, respondent asked Mr. AA to remove his shirt and examined his back. (NT 39-43.)

(17) Over the course of his next several visits to respondent's office, respondent asked personal questions concerning his sexual habits and sexual relationship with his girlfriend. (NT 39.)

(18) Respondent advised Mr. AA not to discuss anything that occurred or was said in his office. Respondent also repeatedly told Mr. AA that he would have to trust respondent completely. (NT 39.)

(19) During one of Mr. AA's initial visits to respondent's office, respondent advised Mr. AA that he needed to examine his lymph nodes to make sure that he did not have an internal infection. (NT 45-46, 47.)

(a) Respondent asked Mr. AA to pull his shorts down, which Mr. AA did; (NT 47-48.)

(b) Respondent then touched the inside of Mr. AA's thighs while Mr. AA was wearing his boxers and his shorts were around his ankles; (NT 48-49.)

(c) Respondent assured Mr. AA that he wasn't gay, and that he knew what he was doing; (NT 48.)

(d) Respondent assured Mr. AA that doctors and attorneys go hand in hand, that respondent was familiar with the medical field, and that medical knowledge was part of being a personal injury attorney; (NT 48.) and

(e) Respondent advised Mr. AA that he wanted to monitor his lymph nodes to make sure that he didn't have an infection. (NT 50, 74.)

(20) During another one of Mr. AA's office visits, respondent advised him that respondent needed to examine his lymph nodes again. (NT 52, 53.) The following events occurred:

(a) Respondent asked Mr. AA to take his shorts down, and he did; (NT 53.)

(b) Respondent stuck his hand in Mr. AA's groin area; (NT 54.) and

(c) During the course of this "examination," respondent pulled on Mr. AA's boxer shorts in such a way as to expose his penis twice. (NT 54.)

(21) During another office visit, respondent asked Mr. AA if he could check his lymph nodes, and the following occurred:

(a) Mr. AA stated that he wasn't wearing any underwear; (NT 56.)

(b) Respondent told Mr. AA that it did not matter, because respondent had seen him previously; (NT 56.) and

(c) Respondent told Mr. AA to hold his shirt up and unfastened Mr. AA's pants, pulled his pants down and began feeling Mr. AA's inner thighs near his groin area. (NT 57.)

(22) During one of Mr. AA's office visits, respondent told Mr. AA that he was representing another young man who he said looked like Mr. AA. He asked Mr. AA if respondent could take pictures of him in his boxer shorts because the other boy had been mangled in a bad accident. Respondent offered to pay him for the photographs. Mr. AA didn't answer. Respondent never asked again. (NT 58, 59.)

(23) During another office visit, respondent asked Mr. AA how he was feeling. Mr. AA told respondent that he was having neck pain and his girlfriend was also having problems with her sciatic nerve. (NT 62.) Respondent offered to show Mr. AA some exercises to alleviate back pain. Respondent instructed him to lie on his back on the floor and pull his knees up to his chest. (NT 62.) At some point during these exercises, respondent told Mr. AA that his jeans were too tight to do the exercise properly and instructed him to take his pants off, which he did. Respondent then showed him the exercises. (NT 62-63.)

(24) On December 18, 1999, Mr. AA gave respondent written authority to settle his case for any amount that he

believed to be fair without prior consultation. (NT 1439; PE-1B.)

(25) Mr. AA called respondent to cancel an appointment scheduled for January 22, 2000, because he had a kidney stone removed. During that call, respondent told him he had papers to sign to finalize his personal injury case. (NT 67.)

(26) Mr. AA went to see respondent on January 29, 2000. (NT 68.) At this meeting, respondent asked Mr. AA how he was feeling since his kidney stone had recently been removed. Mr. AA stated that he still had some pain. (NT 69.)

(27) At this time, respondent related to Mr. AA a story about a client who had suffered an injury to his penis as a result of a kidney stone surgery that caused the client to be incapable of ejaculating. Respondent advised Mr. AA that he would like to physically examine his penis to make sure he did not incur a similar injury from his kidney stone surgery. (NT 69.)

(28) Respondent then pulled down Mr. AA's pants and told him that his penis needed to be erect for respondent to determine whether he had been injured. (NT 70, 71.) Respondent then told Mr. AA not to watch and began stroking Mr. AA's penis. (NT 71.)

(29) When Mr. AA had difficulty getting an erection, respondent told him to close his eyes and to think about his girlfriend or a girl on the beach. (NT 71.)

(30) Mr. AA ejaculated into respondent's hand. (NT 71.)

(31) Respondent then told Mr. AA to wait before pulling up his pants so that respondent could examine Mr. AA's penis again. Mr. AA got dressed after respondent looked at Mr. AA's penis. (NT 73.)

(32) Respondent then asked Mr. AA if he was embarrassed and asked repeatedly whether he was going to tell anyone about the incident. Mr. AA answered that he was embarrassed but would not tell anyone what had taken place. (NT 73-74.) Respondent continually asked Mr. AA if he was okay. (NT 75.)

(33) Respondent told Mr. AA that he wanted him to come back next Saturday. (NT 74.) Mr. AA agreed. Mr. AA said and did what he had to do to get out of respondent's office without any more communication. He was feeling very embarrassed and confused about what had just happened. (NT 74, 75.)

(34) When Mr. AA left respondent's office, there were people in the waiting room outside respondent's office. He didn't want anyone to know or think anything had happened. He "just wanted to get out of there." (NT 137.)

(35) Later that day, Mr. AA told his girlfriend, BB, what had occurred during his meeting with respondent. Mr. AA, accompanied by Ms. BB, reported the incident to the [   ] Regional Police Department. (NT 76; PE-1C.)

Testimony of Officer EEE Regarding the AA Matter:

(36) Officer EEE made a police report and took a written statement from Mr. AA on January 29, 2000, the same day that the indecent assault allegedly occurred. Mr. AA wrote that respondent had examined his lymph nodes on two or three occasions and respondent had requested that he be permitted to stroke Mr. AA until he ejaculated. Mr. AA wrote that he ejaculated into respondent's hand. (PE-1C.)

(37) At the time of the interview, Mr. AA orally told Officer EEE that respondent had made him strip down

to his underwear to perform some exercises, but Mr. AA had not included that information in his written statement to the police. (NT 141; PE-1C.)

(38) Officer EEE conferred with the district attorney's office, and determined that it was not a criminal act, because there was some consent to the act. (NT 144.) Officer EEE described AA's demeanor as nervous, embarrassed, and scared. (NT 148.) He could not recall whether Mr. AA cried or was teary-eyed during this interview. (NT 148.)

Testimony of BB regarding the AA Matter:

(39) On January 29, 2000, Mr. AA confided in BB, Mr. AA's girlfriend, that respondent had masturbated him in respondent's office. Ms. BB then convinced Mr. AA to go to the police and make a report. (NT 180.) Ms. BB accompanied Mr. AA to the police station. (NT 180.)

(40) On January 31, 2000, BB called respondent's office at approximately 9:20 a.m. and told his secretary that AA was firing him. (NT 181; PE-2A, 2B.) Respondent's secretary then put respondent on the phone. Ms. BB stated that the reason for termination was respondent had given her boyfriend a "hand job," and respondent denied the accusations. When Ms. BB advised respondent that she intended to report him to the Pennsylvania bar, respondent asked his secretary to get the telephone number and address of the Office of Disciplinary Counsel. Ms. BB hung up on him. Ms. BB's phone records indicate this telephone call lasted one minute. (NT 182, 191, 196, 1135; PE-2A, PE-2B.)

(41) Respondent telephoned Ms. BB twice after Ms. BB's initial phone calls. According to respondent's phone records, these calls lasted approximately three and one-

half minutes and 13 and one-half minutes, respectively. (NT 186-87; PE-2C.)

(42) During these phone calls, respondent told her that Mr. AA must be confused because he had told Mr. AA a story about a man he had represented who had a penis injury from a kidney stone removal, and Mr. AA must be scared about that. Respondent continually asked Ms. BB if she and Mr. AA would come to his office to discuss this matter, asked how he could make it better, and offered to lower his fees. (NT 184, 185; PE-2C.) Ms. BB asked respondent the reason why he was willing to lower his fees, and why he wanted them to come into his office and settle this matter if he hadn't done anything wrong. (NT 185.)

(43) Respondent kept asking how he could make it up to them, that he wanted Mr. AA and her to come into the office, that he wanted to talk to Mr. AA, and offered to reduce his fee. (NT 185-86.)

(44) Respondent told Ms. BB that the case had settled even though he had told Mr. AA on Saturday that the case was not settled. (NT 186.)

(45) The following day, February 1, 2000, Ms. BB faxed a letter to the insurance adjuster handling Mr. AA's personal injury case, and advised him that respondent was no longer Mr. AA's attorney, and he should not permit respondent to settle this case. (PE-3D.)

(46) After Mr. AA terminated respondent's representation, he retained Attorney KKK, to complete the personal injury action for which he had originally retained respondent, and to discuss what action, if any, could be taken against Mr. Frankel as a result of the "sexual assault" on AA. (NT 195, 202, 203; PE-4A, PE-4B, PE-4C, PE-4D, PE-4E, PE-4F.)

## Testimony of Attorney KKK
## Regarding the AA Matter:

(47) Attorney KKK worked in [ 's] office and has been an attorney for 18 years. (NT 149.) He received a telephone call from Ms. BB who explained that respondent had sexually assaulted her boyfriend and requesting that Attorney KKK complete Mr. AA's personal injury case. (NT 150.) Attorney KKK met with Mr. AA and Ms. BB on February 1, 2000. Their reasons for dismissing respondent were twofold: (1) the "sexual assault"; and (2) on Saturday, January 29, 2000, AA was under the impression that the case had not yet been settled; however, when BB telephoned respondent first thing on Monday morning to fire him, respondent told her the case was settled. (NT 150.) AA and BB wanted to know what, if anything, could be done concerning the sexual assault. (NT 151.)

(48) Attorney KKK referred Mr. AA to Attorney LLL to represent them on the sexual assault because he knew that Attorney LLL was representing Mrs. BBB on a sexual assault case against respondent, and it was common knowledge that Attorney LLL and respondent did not get along. (NT 151.)

(49) Neither BB nor AA mentioned the Mrs. BBB case nor did they mention any lawsuits brought against Mr. Frankel. (NT 151.) They did not ask to be referred to any specific attorney. (NT 152.)

(50) Mr. AA told Attorney KKK that he didn't want him to seek additional money in settlement of the personal injury case. He just wanted the case to be finished. Neither BB nor AA expressed any dissatisfaction with the $6,000 that respondent had previously negotiated on

behalf of Mr. AA. (NT (VS) 111-12, 125-26; NT (GM) 153; NT (CM) 202; PE-4A-D.)

(51) Respondent testified that AA, BB, Attorney LLL and Attorney MMM were part of a conspiracy to extort money from him. (NT 1694.) Respondent and Attorney KKK had a good relationship over the years, but he [Attorney KKK] "might take a shot at me to help his business." (NT 1695.) He admitted that prior to Attorney KKK's testimony, he considered Attorney KKK a friend. (NT 1698.) When asked if Attorney KKK would lie under oath in order to help [   's] law practice, respondent said, "I think that he would bend the truth, whether or not he's an out-and-out liar, or he might forget something or have convenient amnesia." (NT 1696.)

(52) Respondent admitted that he saw Mr. AA approximately 10 times in his New Oxford office (NT 1418; PE-24 p. 18.), but he has no entries for any office visits on AA's client card. (NT 1419.)

(53) Respondent did not have a secretary at his New Oxford office at the time that he was representing Mr. AA. (NT 1419.)

(54) Respondent stated that he saw seven or eight clients, including Mr. AA, between 9 a.m. and 12 p.m. on January 29, 2000. (PE-23, p. 46.) Only three people were listed in respondent's appointment book for that date. Neither Mr. AA nor CCC were listed in the appointment book, even though there is no dispute that they saw respondent in his New Oxford office on January 29, 2000. (PE-23 [depo. exhibit-1].)

(55) Respondent testified that he and Mr. AA had discussions of sexual activities including Mr. AA having anal sex with his girlfriend, but respondent denied that he had initiated those discussions. (NT 1428-29.) Re-

spondent testified at deposition that Mr. AA was constantly talking about sex with his girlfriend and anal sex, and that respondent once told Mr. AA that respondent found it embarrassing. (PE-23, p. 26.)

(56) Respondent admitted that he examined Mr. AA's back when Mr. AA's shirt was pulled up, and he may have touched his back. (NT 1426; PE-23, pp. 30, 31.)

(57) Aside from handshakes, respondent denied that he touched Mr. AA except when he had Mr. AA remove his shirt and touched his back. (PE-23, p. 66.)

(58) Respondent didn't consider his actions in examining Mr. AA's back a physical exam; but if a client tells him that they have an injury to some part of their body, he is going to look to see where it is so he can document and determine if it has to be photographed. (PE-23, p. 32.)

(59) Respondent tells his clients that he wants to know everything about them or their cases, and that they need not hold anything back, because they need to trust him. He also tells his clients not to discuss anything that goes on in the office with other people. (NT 1423, 1424.)

(60) Respondent told Mr. AA that people have lymph nodes in the arms and their neck and groin, but denied that he told Mr. AA that he had to examine his lymph nodes. (NT 1427.)

(61) Respondent showed Mr. AA some back exercises to help him and his girlfriend, but denied that either he or Mr. AA had lain down on the floor to do those exercises. (NT 1429-30.)

(62) Respondent admitted, notwithstanding his contrary answer to the DB-7 letter (PE-45), that there was enough room in his New Oxford office so that somebody could lie down if they wanted to. (NT 1450.) Re-

spondent denied that he demonstrated the exercises for Mr. AA on the floor. (NT 1451.)

(63) Respondent testified at deposition that he had told Mr. AA about an exercise that his trainer had taught him where you lie down, and put the opposite arm out while pulling up and crossing over the opposite leg (PE-23, p. 46), but respondent claimed that he showed the exercise to Mr. AA while he was standing up. (PE-23, p. 46.)

(64) Respondent talked to Mr. AA about his kidney stones. (NT 1443.) Mr. AA was afraid that he might have more kidney stones. Respondent told Mr. AA that if somebody puts a tube up you that many times, he would be afraid that they could cause damage to it. Respondent informed Mr. AA that, if they did damage to his penis, he might have a case. (PE-23, p. 63.)

(65) Respondent never personally sued anyone or made a claim against anyone based on injuries resulting from the insertion of a catheter, or as a result of damage done by a transurethral removal of a kidney stone, but someone had come into the office after having had a catheter inserted and they had ripped part of the urethra at the glands. (PE-23, pp. 64, 65.)

(66) Respondent denied ever having examined a client's genitals except for one client who had a twisted testicle, which he saw. (PE-23, p. 33.) In deposition, respondent was asked, "The only client you can remember doing a physical [sic] looking at the male genitals was a client that had a testicle problem?" Respondent answered, "I can't say that as a result of looking at somebody that may have been in the hospital or some other area that I might have seen their genitals." (PE-23, p. 34.) Respondent later stated, "I'm saying under oath today that I don't believe that I specifically asked to look at a client's geni-

tals unless there was a case that somehow involved that." (PE-23, p. 34.) When asked if there were only one instance where he had inspected a male's genitals, respondent said, "I guess if I sat down and thought about it, there may be more." (PE-23, p. 3.)

(67) Respondent testified that during his representation of Mr. AA, Mr. AA had told him that his girlfriend wanted to know about the sexual misconduct case that Mrs. BBB had brought against respondent. Respondent had told Mr. AA that Mrs. BBB did not have a case, and that she was being represented by Attorney LLL, who had a "psycho hatred" of respondent. Respondent further claimed that he told Mr. AA that Mrs. BBB would have had a better case if she had gone to the police immediately after respondent's alleged sexual assault and that at least Mrs. BBB was "not a guy" and "not a client" making those allegations. (NT 1435-36; PE-23, pp. 76-78.)

(68) Respondent testified that BB said several times during their phone conversation on January 31, 2000, that she was going to the same lawyer who was handling the BBB case or she may have said that she was going to the lawyer who represented the lady who respondent grabbed in the bar. (PE-23, pp. 79-80, 83.)

(69) Ms. BB's phone call to him lasted a few minutes. Since respondent had already received the check and release, respondent kept telling Ms. BB that he needed to talk with AA. (NT 1465.) During that call, Ms. BB was screaming and yelling, and making allegations such as he had masturbated AA. Respondent denied the allegations and suggested that she should go to the police and the Disciplinary Board. (NT 1464, 1466; PE-23, pp. 81-84.) Respondent said that Ms. BB specifically told him

that she was going to Attorney LLL. (NT 1466.) She said that they were going to the same lawyer that represents the lady who's suing you. (NT 1466.) He then told her that he had to go because he had somebody else on the other line. (NT 1465; PE-23, pp. 81, 88.) Respondent called her back a few minutes later. Respondent testified in his deposition that there were only those two calls, one from Ms. BB and his return call (PE-23, pp. 81, 83.), but in his disciplinary hearing testimony, he acknowledged that there might have been three phone calls. (NT 1465.) Respondent kept insisting on speaking with AA, and Ms. BB kept refusing to permit him to do so. (NT 1466.)

(70) Respondent told Attorney KKK that he never did anything to AA, but if it happened like BB said, he [AA] would have had to consent to it. (PE-23, p. 94.) Respondent claimed that the AA lawsuit was another attempt by Attorney LLL to extort money and destroy his reputation. (PE-23, p. 95.)

(71) Respondent claimed that Attorney KKK had told him that $6,000 as settlement in the AA case was a good amount, and that he thought that he had done a good job for him. (PE-23, p. 96.)

Additional Findings Regarding the AA Matter:

(72) Attorney LLL testified that he represents AA in a civil matter against the respondent and has made various referrals of individuals to the Office of the Disciplinary Counsel to pursue complaints against respondent.

(73) The testimony of AA and BB is found to be credible.

(74) The testimony of Attorney KKK is found to be credible.

(75) The testimony of the respondent, to the extent that it is inconsistent to the testimony of AA, BB and Attorney KKK is found not credible.

*The XX Matter*

Testimony of XX:

(76) XX, complainant, retained respondent to represent him on two unrelated criminal matters in late fall 1998 and in 1999. (NT 823-25, 833, 835; PE-25, PE-26, PE-27, PE-28, PE-29, and PE-30.)

(77) At the time, Mr. XX was 18 or 19 years old. (NT 823, 863.) He had left school while in the seventh grade. (NT 863, 864.)

(78) Respondent met with Mr. XX multiple times at his New Oxford office. (NT 827.)

(79) At one of the initial meetings, respondent told XX about a man he had represented who had been accused of rape. Respondent told Mr. XX that the alleged victim claimed that the man was circumcised. Respondent made the defendant show his penis to the jury to prove that he wasn't circumcised, and he was able to get his client acquitted. (NT 828.)

(80) Respondent explained that if he hadn't known everything about his client he would not have been able to secure an acquittal. (NT 828.)

(81) Respondent asked Mr. XX's father to step out of the room, and then he asked Mr. XX if he had any scars or tattoos. (NT 829-30.)

(82) Mr. XX advised respondent that he had had a hernia operation as a small child, and that he had a scar from the operation. (NT 828, 830.)

(83) Respondent asked Mr. XX to see his scar. (NT 828.) Mr. XX pulled his pants down to his knees. Respondent then asked him to come to the side of his desk and to pull his pants down completely. Mr. XX dropped his pants. Respondent rubbed his hand across Mr. XX's scar and down the inner part of his leg. The back of respondent's hand touched Mr. XX's testicles. (NT 830.)

(84) Sometime between September 1998 and August 1999, respondent told Mr. XX that he would have to photograph his scar, and respondent would have a camera at the next visit. (NT 831, 834.)

(85) After one of Mr. XX's appointments with respondent, Mr. XX told his father that he thought respondent was gay because of some of the things that respondent said and did. Mr. XX said that he didn't go into much detail, because he was embarrassed. His father told him that he had already paid respondent, and there wasn't much he could do about it. (NT 836.)

(86) Respondent arranged for Mr. XX to meet with Trooper FFF in order to cooperate with the police in hope of getting a lenient plea bargain on his drug charges. (NT 839.)

(87) Respondent had scheduled a meeting with Trooper FFF, but Mr. XX failed to attend the meeting, so respondent rescheduled the meeting. (NT 839.)

(88) Both XX and his father went to respondent's office for the meeting with Trooper FFF, and recalled that XX had gotten a traffic citation for making an improper turn that night. (NT 840.)

(89) Immediately after Officer FFF left the meeting, respondent asked complainant to remain in his office and the following occurred:

(a) Respondent closed the door and told Mr. XX that he was concerned about where he would wear a wire and requested to see Mr. XX's scar again; (NT 841)

(b) Respondent asked Mr. XX to come around the side of the desk and take his shirt off; (NT 841-42)

(c) Respondent asked Mr. XX to pull down his pants and his boxers; (NT 842)

(d) Mr. XX lowered his pants and boxers; (NT 842) and

(e) Respondent touched his hand to his scar and ran his hand down the side of his leg. (NT 842.)

(90) Mr. XX's scar was only about an inch or an inch-and-a-half below his beltline, and there was no need for respondent to ask Mr. XX to pull his pants and boxers down in order to see the scar. (NT 842.)

(91) Respondent's representations that he needed to view and photograph Mr. XX's scar in order to effectively represent him were false; respondent lied to Mr. XX so that he would permit respondent to view him in a partially disrobed state and to photograph him for respondent's own sexual gratification. Respondent never took the photographs that respondent requested.

(92) Sometime after August 25, 1999, respondent visited Mr. XX while he was incarcerated as a result of a bench warrant, at which time the following occurred:

(a) Respondent asked Mr. XX to describe what he was wearing, including the color of his underwear, and asked him whether the guards were able to see him showering; (NT 847.)

(b) Respondent asked Mr. XX why he should continue to represent him; (NT 846, 848.)

(c) Since this was the first time that Mr. XX had been in jail, he was scared and he told respondent that he would do anything to get out of jail and begged respondent to represent him; (NT 846, 848.)

(d) Respondent told Mr. XX that respondent would only continue to represent him if he was willing to do everything that respondent asked him to do; *i.e.,* that if respondent asked him to run around the square in New Oxford naked, he would have to do it; (NT 848.)

(e) Respondent also told Mr. XX that he would help him get his GED, a job and he could even use respondent's name as a reference; (NT 848.) and

(f) Respondent told him that once he got out of jail, he would have to meet with respondent once a week. (NT 848.)

(93) Mr. XX pled guilty to the charges in [    ] and [    ] County and was released shortly thereafter. (NT 849.)

(94) After Mr. XX got out of jail, respondent called and asked him to come to respondent's New Oxford office. (NT 849.) Mr. XX lied and told respondent that he did not have transportation. (NT 850.) Eventually, he went to see respondent at respondent's New Oxford office, even though he had no charges pending. (NT 850.) Mr. XX went to see respondent because he needed a job, and he thought that respondent could help him. (NT 851.)

(95) At one of respondent's first meetings with Mr. XX after he got out of jail, respondent gave him a couple of places to look for a job and told Mr. XX that he could use respondent as a reference. (NT 851-52.)

(96) Respondent asked Mr. XX questions about whether he had sex with his girlfriend and whether he

masturbated. Respondent told Mr. XX that he wanted to test him and degrade him to see how far he would go. He also told Mr. XX that he wasn't gay. (NT 852.)

. (97) Respondent told Mr. XX to sit in a chair, and to remove one article of clothing every three minutes (NT 853) and the following occurred:

(a) Mr. XX complied with respondent's test until he was sitting in front of respondent in his boxer shorts; (NT 853.)

(b) When Mr. XX made no effort to remove his boxer shorts, respondent asked him why he wasn't following through; (NT 853.)

(c) Mr. XX asked respondent whether respondent expected him to take off his boxers, to which respondent replied yes; (NT 853.)

(d) Mr. XX was eventually sitting in front of respondent totally naked; (NT 854.)

(e) Respondent then told Mr. XX to relax and picture himself sitting on the beach with the sun beating down on his body; (NT 854.)

(f) Respondent asked him if he could feel the sun beating on the various parts of his body, and whether he could feel the heat on his penis; (NT 854.)

(g) Respondent also told him that this was a relaxation exercise. (NT 856.)

(98) Respondent "tested" Mr. XX on a second occasion when respondent again requested that he remove one article of clothing every three minutes until he was naked. Respondent again asked him to picture himself on the beach with the sun beating down on various parts of his body, until he could feel the warmth on his penis. (NT 856.)

(99) On various occasions, respondent asked Mr. XX very personal questions about his sex life, which was completely unrelated to the legal representation. (NT 852.)

(100) On one occasion, respondent asked Mr. XX something like, "Can you or will you masturbate in front of me right now?" and Mr. XX said no. (NT 900.)

(101) In approximately January 2001, respondent requested that Mr. XX do the relaxation exercise again; *i.e.,* to remove an article of clothing every three minutes; however, when he was sitting in respondent's office partially disrobed, they both heard someone enter respondent's building. Respondent came back in the room and asked complainant to get dressed. (NT 858.)

(102) XX told his girlfriend how uncomfortable he felt going to see respondent, and explained some of the things that respondent wanted him to do. (NT 843-44.)

Testimony of YY Regarding the XX Matter:

(103) YY testified that he would accompany his son, XX, to appointments with respondent. (NT 927.) On the second appointment, Mr. YY asked to use the bathroom. Respondent told him where it was located, and then suggested that he should not return to the room, because there were some things that he needed to discuss with XX. (NT 927.)

(104) On one occasion, respondent told Mr. YY that he needed to examine his clients. He said it was very important that he do that. Respondent then told a story about an 18- or 19-year-old who was arrested on a rape case, and because respondent did a physical examination, he was able to get him acquitted. Respondent told him that the judge made the boy disrobe in a courtroom,

because this boy had a wart or blemish on his penis, and the purported victim had not said anything about a wart or blemish. (NT 927.) Mr. YY thought it sounded like a very bizarre story. (NT 927.)

(105) XX told his father that something was wrong with respondent, that he wanted XX to take his clothes off. XX had said that it wasn't a rape case. Mr. YY told his son that he had already paid respondent and he didn't have money for another attorney. Mr. YY asked if XX could keep respondent away from him and XX said that he could. (NT 928.)

(106) Mr. YY said that he waited for his son in respondent's waiting room when XX met with Trooper FFF and respondent to discuss his cooperating with the police. Trooper FFF left the meeting, and about 20 minutes later, XX came down the stairs quickly and was "white as a ghost." (NT 929-30.) XX did not say anything to his father, but respondent, who was behind XX, said to YY, "Where did (XX) get his scar?" YY answered respondent that XX had gotten the scar when he had a hernia operation. (NT 931.)

(107) When XX got in the car, he was beating on the steering wheel. (NT 931.) XX told his father that respondent was a "full-blown faggot." (NT 931.) YY wasn't sure if he asked his son any questions about whether respondent had touched him. (NT 931.) YY assumed that respondent must have examined XX's scar, because respondent asked him about XX's scar. (NT 931.) YY recalled the date of this incident because his son got a traffic ticket on the way to the meeting, which was March 10, 1999. (NT 933; PE-30.)

(108) Respondent called YY and asked him if he had read anything in the newspapers about him. Mr. YY ex-

plained that he doesn't read the newspaper, but he had heard about the lawsuits. (NT 933.) Respondent asked Mr. YY what he thought about the lawsuits. Mr. YY had answered, "I'd hired him for his professional ability, not his sexual preferences." (NT 934.)

(109) When XX was later charged with escape, his family decided not to retain respondent on the new matter. (NT 935.) They did not think that respondent was doing a good job. His family also felt that respondent might have some ulterior motives for representing XX. (NT 935.) Therefore, XX's grandmother and his great-grandfather retained [   ] to represent XX.

(110) YY believed that [   ] made some inquiries into the court system, which led to Attorney LLL contacting him. (NT 935, 943.) Attorney LLL contacted YY and asked him if his son would be willing to be a witness in a case against respondent. (NT 935.) YY told Attorney LLL that his son may actually have a case against respondent, and asked Attorney LLL if he would take the case. Attorney LLL refused because respondent was claiming that Attorney LLL had a vendetta against him. (NT 937.)

(111) Mr. YY indicated that XX discussed respondent's misconduct with him in the presence of YY's fiancée, his mother, XX's mother and XX's great-grandfather. (NT 939.) YY does not recall XX ever telling him that he had been touched by respondent. (NT 940.)

(112) [   ], Esquire, filed a lawsuit on behalf of XX against respondent. (NT 949.) Mr. XX testified that the purpose of filing the lawsuit was threefold: (1) to wipe the slate clean; (2) respondent had done things that weren't appropriate; and (3) to obtain money damages. (NT 952.)

### Testimony of GGG Regarding the XX Matter:

(113) GGG dated XX from January 1996, through August 1999. (NT 812.) Sometime in summer 1999, Mr. XX told her that respondent asked Mr. XX to remove his pants and to lift his shirt because he wanted to see if he had any birthmarks or defects. (NT 813, 814.) Ms. GGG has not communicated with XX since they broke up in December 1999, but XX has written to her. (NT 815, 816.) Ms. GGG testified that XX said that he was embarrassed, and he was afraid to tell her because he thought that she would make fun of him and tell him that he was stupid that he did the things that respondent requested him to do. (NT 818.) Ms. GGG heard XX tell his father and his family about the incident. (NT 814.) Ms. GGG said that XX's father was aware of the incidents before she was aware of them. (NT 819.) Ms. GGG has no criminal history.

### Testimony of Respondent Regarding the XX Matter:

(114) Respondent admitted that he was on friendly terms with YY. (NT 1747.)

(115) Respondent admitted telling a client, HH, the following story:

"There was a case in Adams County and it involved a rape victim . . . During the course of the testimony, the complaining witness said that the defendant had some kind of a mark, or a mole, on his penis that was identifiable which she had seen during the rape . . . While the matter was being considered by the jury, some person . . . came up to the defense counsel and said, 'Look, I've seen his penis and that is no mole.' So what happened next is bizarre, but the DA and prosecution could have looked at it, but instead, he went into the jury box, pulled

down his pants and went up and down showing his penis, each one saying, 'Move it that way.' And that happened. That was the story I told him." (NT 1547.)

(116) Respondent denied that he ever asked to see XX's scar. (NT 1497.) Respondent denied that he ever touched XX. (NT 1502.) Respondent recalls telling XX, "If I ask you to run around the square naked, you better do it." (NT 1503.) Respondent explained that he made this statement to impress upon XX that he had to do everything he said with regard to his case. (NT 1503.) Respondent denied ever having asked XX to remove his clothes. (NT 1504.)

(117) The testimony of XX regarding the respondent's inappropriate request to view Mr. XX and/or inappropriate touching by the respondent of Mr. XX is found to be credible.

(118) To the extent that the respondent's testimony contradicts the testimony of XX on the issues of inappropriate viewing and/or touching, the respondent's testimony is found not credible.

(119) The testimony of GGG is found to be credible. Specifically, Ms. GGG testified that XX reported to her sometime in the summer of 1999 that the respondent had asked Mr. XX to remove his pants and to lift his shirt because he wanted to see if he had any birthmarks or defects. Ms. GGG further testified that XX said he was embarrassed and was afraid to tell her because he thought she would make fun of him.

(120) To the extent that the respondent's testimony contradicts the testimony of GGG, and specifically regarding XX's reports that the respondent had asked him to remove his pants and lift his shirt, the respondent's testimony is found not credible.

*404(b)(2) Witnesses*

Testimony of HH and II:

(121) Respondent represented Mr. HH in 1998, when he was charged with statutory sexual assault, corruption of the morals of a minor, furnishing liquor to a minor and possession of a prohibited offensive weapon. (NT 422.) At the time of this representation, Mr. HH was 22 years old. (NT 421, 422.) Mr. HH had left high school during his senior year. (NT 427, 428.)

(122) Early in the representation, respondent told Mr. HH about a case where the victim claimed that the defendant had a mole on his penis and that the defendant actually showed his penis to the jury. Since the defendant's penis didn't have a mole, the defendant was acquitted. (NT 424.)

(123) Thereafter, respondent asked Mr. HH if he had any unusual marks on his penis, and he said that he did not. Respondent told Mr. HH that he would have to see for himself. (NT 424, 425.)

(124) II accompanied Mr. HH to see respondent because he had been present with Mr. HH on the night Mr. HH allegedly committed the statutory assault. At the time, Mr. II was 23 years old and had a ninth grade education. (NT 442, 437.)

(125) Mr. HH's mother also accompanied Mr. HH and Mr. II to respondent's office. (NT 438.)

(126) When respondent was alone with Mr. II, he discussed Mr. HH's case for a few minutes. Respondent then asked Mr. II how modest he was. He asked Mr. II if he would be interested in helping with another client's case. Respondent told Mr. II that his client had a piece of exercise equipment collapse on him and it broke the client's

femur. (NT 439.) Respondent told Mr. II he had a similar build as his client. (NT 439.) Respondent told Mr. II that he wanted to have a computer outline done of Mr. II's body, but first he would have to see Mr. II in his underwear. Mr. II refused. (NT 440.)

(127) Respondent denied asking Mr. II to pose for him in his underwear. (NT 1552.)

(128) Mr. HH's mother testified that she accompanied her son, HH, and II to respondent's office. She was not sure of the date, but believed it to be around July 1998. (NT 446, 449.) Mrs. JJ was asked to leave the room, because respondent wanted to talk with her son by himself and then to Mr. II alone. (NT 447.)

(129) Mrs. JJ testified that when Mr. II left the office he was upset and said that respondent had asked him to drop his pants down to his boxers, but that Mr. II refused to do so. (NT 448.)

(130) HH told his mother that respondent had asked to see his penis to see if there was anything unusual about it for his case. (NT 448.) Mr. HH also told her that he showed respondent his penis, because he thought it was for the case. (NT 449.)

(131) Mrs. JJ may have told her employer what occurred with her son and respondent, but she really didn't know what to think about what respondent had done and took no further action. (NT 454, 455.)

(132) At a later time, respondent helped HH on an unrelated matter. Mrs. JJ wrote respondent a thank you note for his help on that unrelated matter. The letter was received in respondent's office on March 15, 2001. (NT 449-52; RX-8.)

Testimony of Respondent Regarding the HH Matter:

(133) Respondent did not believe that Mr. HH was part of the conspiracy to extort money from him. (NT 1705.)

(134) Respondent believes that investigators went to bars trying to solicit witnesses against him and that Mr. HH was probably influenced by one of these investigators. (NT 1703.)

(135) Respondent acknowledged telling HH the story about the defendant who had a mole on his penis. (NT 1547.)

(136) Respondent acknowledged asking Mr. HH if he had any identifying marks but denied examining his penis. (NT 1548.)

(137) Respondent sought to impeach Mr. HH's testimony by noting that Mr. HH sought representation from the respondent for criminal charges that included sexual assault and corruption of the morals of a minor.

(138) HH testified that he told II about respondent's improper viewing of his penis immediately after it happened, while Mr. II testified that HH told him about it after HH's preliminary hearing. (NT 441.)

(139) Respondent attempted to impeach Mrs. JJ's testimony by pointing out that Mrs. JJ wrote a thank you note to the respondent a year and half after the events described by her son occurred.

Additional Findings on the HH and II Matters:

(140) The testimony of HH, II, and Mrs. JJ is found to be credible.

*The LL Matter*

Testimony of LL:

(141) LL's family retained respondent to represent him on criminal charges of burglary, theft and other theft related charges in 1992 and 1993, to which he pleaded guilty. (NT 576, 584, 586.) Mr. LL was 19 or 20 years old at the time, and he was going into his first year of college, first semester. (NT 577.)

(142) During the representation, Mr. LL met with respondent on a number of occasions. Normally, his father was with him, but on one occasion, early in the representation, respondent requested to meet with Mr. LL alone. (NT 577-78.)

(143) When Mr. LL went to respondent's office alone, respondent told Mr. LL that he had to trust respondent. (NT 578.) Respondent told Mr. LL to pull his pants down because Mr. LL needed to do whatever respondent said as a test to show respondent that Mr. LL trusted him. (NT 581, 582.)

(144) Respondent was sitting behind his desk. When Mr. LL got his pants down, respondent came from behind the desk toward Mr. LL, and Mr. LL pulled down his underwear. Mr. LL did not know whether respondent sensed that he was uncomfortable, but respondent told Mr. LL to pull up his pants and he went back behind the desk. Respondent came within touching distance of Mr. LL, but did not touch him. (NT 579.)

(145) At the moment that he pulled down his pants, he felt very humiliated, and he was scared that he was going to go to jail for a very long time and he was only 18 years old. (NT 601.) Mr. LL said that he did it because

he was in a lot of trouble, and he had never been in that kind of trouble, so he did whatever his lawyer told him to do. (NT 581.)

(146) Years later, Mr. LL read a newspaper article in the *York Dispatch* that respondent had done something similar to another young man involving an examination of the young man's lymph nodes. (NT 582.) He believes he contacted the attorney who was handling the case for the young man who he had read about in the newspaper. (NT 583, 596, 597.) He had no desire to bring a civil lawsuit against respondent. (NT 598.) He was not asked to testify for anyone in a civil lawsuit against respondent. (NT 602.)

Testimony of Respondent Regarding the LL Matter:

(147) Respondent denied ever asking Mr. LL to remove his clothes. (NT 1559.)

(148) The respondent sought to impeach Mr. LL by pointing out that Mr. LL has been convicted of numerous burglaries and related crimes of theft and receiving stolen property. (NT 576.)

(149) The respondent sought to impeach Mr. LL by pointing out that Mr. LL never told anyone of the alleged offense at the time it happened or thereafter. (NT 601.)

(150) The respondent sought to impeach Mr. LL by pointing out that Mr. LL was extremely angry about his resentencing. (NT 1560.)

(151) Respondent sought to impeach Mr. LL by pointing out that Mr. LL did not contact an attorney concerning the allegation until seven years after it allegedly occurred. (NT 581.)

Additional Findings Regarding the LL Matter:

(152) The testimony of LL is found credible.

## The MM Matter

### Testimony of MM:

(153) In July 1991, MM dislocated his hip as a result of an injury that he sustained as a passenger in an auto-mobile accident. (NT 607.) Mr. MM was approximately 21 or 22 years old when he retained respondent to represent him, and he was a high school graduate. (NT 608, 612, 617.) He believes that he met with respondent a few times at his home and a few times at respondent's York office. (NT 609.)

(154) Respondent told Mr. MM that he had to photograph his scars for future reference or in case the law changed. (NT 609.) Mr. MM was alone with respondent in his York office when these photographs were taken. (NT 609.) Respondent requested that he pull down his pants so he could photograph Mr. MM's scar. Mr. MM pulled his pants and underwear halfway down his leg so that respondent could photograph his scar. (NT 611.) Respondent took photographs from various angles including a front angle, and from the back corner and the front corner. (NT 610.) At the time, Mr. MM did not have any concerns about these photographs or any reason to believe that they were for purposes unrelated to his case. (NT 611.)

(155) Mr. MM went to see another lawyer, Attorney LLL, about another accident in 1995. He asked Attorney LLL if he needed to photograph his injuries. (NT 615.) Attorney LLL asked the reason that Mr. MM had asked that question, and Mr. MM explained that respondent

had taken photographs of his scars for future reference. (NT 615.) Sometime between 1996 and 1999, Attorney LLL suggested that respondent might have misled Mr. MM as to the reason that he took those photographs and suggested that Mr. MM call the Office of the Disciplinary Counsel, which Mr. MM did. (NT 616, 617, 620.)

Testimony of Respondent Regarding the MM Matter:

(156) Respondent admitted that he took photographs of Mr. MM. (NT 1562.)

(157) The respondent denied that he touched Mr. MM in any inappropriate way. (NT 612.)

Additional Findings Regarding the MM Matter:

(158) The testimony of MM is found to be credible.

*The NN Matter*

Testimony of NN:

(159) NN was involved in a car accident and retained respondent to represent him in a personal injury lawsuit in October or November 1992. (NT 625.) Mr. NN had recently finished ninth grade and was 23 years old. (NT 624-25, 626.) As a result of this accident, he had 13 bolts in his hip, two steel plates and a 16-1/2 inch scar. (NT 626.) Mr. NN met with respondent about four or five times. (NT 626.)

(160) During those meetings, respondent asked numerous questions about Mr. NN's sex life, including whether "he was f - - - - - - his wife in the ass." (NT 627.) Mr. NN testified that he never initiated any conversations about sex, only respondent did. (NT 627.)

(161) At some point during the representation, respondent asked to see his scar. (NT 627, 628.) Mr. NN pulled

down the left side of his pants so he could show the scar to respondent, which ran down the left jean seam of Mr. NN's pants. (NT 628.) Respondent said that he wanted him to pull his pants all the way down to his knees and he wanted to look at Mr. NN from the front view. (NT 629.) Mr. NN did not have any injuries to the front of his body, to his penis or to his groin area, and there was no reason for respondent to have to view the front part of his body. (NT 629.)

(162) Respondent then sat on a rolling chair and grabbed Mr. NN's penis, and moved it to the right. (NT 629.) Mr. NN said respondent looked at him to see if he liked it. (NT 629.)

(163) Mr. NN felt bad, ashamed and shocked, and respondent left him alone, because respondent knew he didn't like it. (NT 629, 630.) Respondent never touched him again. (NT 630.) Mr. NN said that he didn't fire respondent because he was so far along in his case, and respondent was the third lawyer he had talked to about this matter. (NT 630.)

Testimony of HHH Regarding the NN Matter:

(164) Mr. NN had previously told HHH, a good friend of Mr. NN's, that respondent had made some moves on him, but that he didn't swing that way. (NT 1193-95.) When she saw an article about respondent molesting boys, she thought that Mr. NN should come forward. (NT 1197, 1198, 1205.) Ms. HHH said that she saw Mr. NN driving down Route 30, and they had pulled to the side of the road. (NT 1196.) At some point, she gave Mr. NN a telephone number of the attorney who was bringing a civil case against respondent for molesting a boy. (NT 1198.)

Testimony of Respondent Regarding the NN Matter:

(165) Respondent denied any sexual conversations with Mr. NN except to the extent of asking him about any sexual activities that he used to be able to do but could no longer do because of his accident. (NT 1565.)

(166) Respondent denied asking Mr. NN to drop his pants before trial. (NT 1570.)

(167) Respondent testified that Mr. NN was not directly part of the conspiracy. "Is he some kind of integral player that they got to something" [sic], "Yes, he testified he wanted money. I believe he also went to Attorney LLL."

(168) Respondent believed that Mr. NN testified untruthfully in the disciplinary matter against him because Mr. NN was also unhappy with the amount of money he received in his personal injury case. (NT 1736, 1750.)

Additional Findings Regarding the NN Matter:

(169) The testimony of NN is found credible.

(170) The testimony of HHH is found credible.

*The PP Matter*

Testimony of PP:

(171) Respondent represented PP when he pled guilty to three counts of burglary in 1995. At the time, PP was 21 years old and had quit school in ninth grade. (NT 684, 687.) Respondent asked him personal questions about his sex life, including whether he masturbated. Respondent initiated their conversations about sex. (NT 687.) Respondent told PP not to have sex with any girls he might be dating, and to masturbate instead of having sex if that's what he needed to do. (NT 687.)

(172) In the course of that representation, respondent asked Mr. PP and his co-defendant, Mr. ZZ, to strip down to their boxers and sing a nursery rhyme on one foot. (NT 688.) Respondent said that he wanted them to do this exercise so that they would trust him. (NT 688.) It was a test and he wanted to make sure that Mr. PP would do everything that respondent asked him to do. (NT 688.) Respondent asked Mr. PP to strip down to his boxers on two occasions, once when Mr. ZZ was present, and another time, when he was alone with respondent. (NT 689, 705.) There were one or two instances when respondent would take his index finger in front of Mr. PP's waist and pull his boxers forward and lean over to attempt to look down his boxers. (NT 703.)

(173) A few years later, PP went to see respondent to see if he could help his girlfriend. Respondent explained to Mr. PP that he had a client that was injured in an accident, and that the client had the same body features, approximate weight and build as Mr. PP. Respondent asked him to strip down to his underwear so he could see his body frame to see how closely it matched his client with the understanding that, if his body was sufficiently similar to his client's build, he would pay him $50 to walk on a treadmill to show how his client would have walked but for his injury. (NT 691.) After PP stripped down to his underwear and permitted respondent to view his body, respondent never asked him to walk on a treadmill, and the subject was not brought up again. (NT 691, 705.)

(174) PP wrote a letter to respondent dated May 2, 1995, in which he specifically referred to the incident where respondent asked him to "strip and sing a nursery rhyme." This letter was written substantially before any

other allegations of sexual misconduct surfaced. (NT 694, 695; PE-21.)

(175) PP also wrote a letter to respondent, which was date stamped as received in respondent's office on June 12, 1998, in which Mr. PP again brought up the fact that respondent had asked him and ZZ to undress:

"There is only thing that has bothered me and still does at times and that is undressing down to my boxers. Of course you know I looked as [sic] it in the beginning as you were testing ZZ and I to see if we would listen to you and do as we were told. Then after the burglary hearing and sentencing I still came to visit you and it continues. It confuses me. I've been told to contact the district attorney's office about it or another attorney because it's supposedly considered improper conduct for whatever reason . . . but for fear of . . . it ending up in the papers with my name in it, I chose not to do it because of the humiliation.

"I spoke with ZZ about this last year and he felt pretty much the same. The reason that this confuses me so much is I never knew what your reason for it was, because there would be other ways for you to test us to see if we would listen to you . . . I had to get this off my chest. I want to trust you because I believe you could help me. But when I brought up undressing on the phone when I called you, you seemed concerned about the prison taping the call. That made me wonder. Perhaps you can stop by and talk about this." (NT 696; PE-22.)

(176) Mr. PP's letter to respondent predated any publicity about any cases in which respondent was accused of sexual misconduct. [Respondent testified that the publicity did not begin until after Attorney LLL filed the BBB lawsuit on September 4, 1998.] (NT 1683; RX-2.)

Mr. PP didn't know of any allegations of sexual misconduct at the time that he wrote the letter. (NT 719.)

(177) After Mr. PP saw the articles about the allegations of sexual misconduct, he contacted Attorney LLL to see about pursuing a case against respondent. Attorney LLL told him the statute of limitations had run, and Attorney LLL referred him to the Office of Disciplinary Counsel. (NT 721-22.)

(178) When PP was recently arrested for simple assault, he again telephoned respondent to represent him. When asked the reason that he wanted to retain respondent, he explained that respondent has helped him over the years with little or no money, and he felt that respondent was the only one he could turn to, given the situation he was in. (NT 699.)

(179) Respondent did not advise PP that he couldn't represent him due to the fact that Mr. PP was subpoenaed to testify against him. Instead, respondent, accompanied by [   ], a private investigator, went to see Mr. PP while he was in jail on the simple assault charges on October 12, 2002, a few days before this disciplinary hearing was scheduled to start. (NT 700.) Respondent told Mr. PP that he would represent him on the simple assault charges "if he told the truth" to the Disciplinary Board, *i.e.,* that PP would tell the Disciplinary Board that the only reason that he was testifying against him was because he was upset with respondent. (NT 703.)

Testimony of Respondent Regarding the PP Matter:

(180) Respondent testified that Mr. PP was mad at him and that is why he decided to go to Attorney LLL. His interest was to get money. (NT 1712.)

(181) The respondent testified that at the meeting with respondent, Mr. [   ] and Mr. PP at the jail, that the respondent forgot to get an affidavit from Mr. PP admitting that he was lying to ODC. (NT 1714.)

(182) Respondent acknowledged that he received the letter of June 12, 1998, and that it was received before publicity regarding his alleged misconduct. (NT 1683.)

Additional Findings Regarding the PP Matter:

(183) The testimony of Mr. PP is found credible. In particular, the letter Mr. PP wrote to the respondent is found credible.

### *The ZZ Matter*

Testimony of ZZ:

(184) Mr. ZZ testified that he was charged with three counts of burglary, trespass, theft and receiving stolen property in approximately 1994. (NT 908-909.) Mr. ZZ retained respondent to represent him on these charges. He was approximately 19 years old at the time, and had finished his junior year of school. He was PP's co-defendant. (NT 909.)

Testimony of Respondent Regarding the ZZ Matter

(185) Respondent denied asking Mr. ZZ to take his clothes off. (NT 1613.)

(186) Respondent pointed out that Mr. ZZ told his parents about the alleged improper viewing and that no complaint was made. (NT 918.)

(187) Respondent noted that, contrary to Mr. PP's testimony, Mr. ZZ testified that the improper conduct occurred in the waiting room. (NT 917, 920, 923.)

Additional Findings on the ZZ Matter:

(188) The testimony of ZZ is found credible.

### The Officer AAA Matter

Testimony of Officer AAA:

(189) AAA is a police officer with [   ] Police Department and he is a sergeant with the [   ] Police Department. (NT 981.)

(190) Prior to becoming a police officer, AAA retained respondent to represent him in a malpractice lawsuit in 1993 against a hair replacement business, whose treatment of Mr. AAA had left him with scars on his head. (NT 982-84.) AAA was approximately 21 or 22 years old, and had just finished high school. (NT 983.)

(191) At the first meeting, respondent asked AAA to answer some very personal questions. Respondent asked Mr. AAA if he masturbated, how he felt after he masturbated, and if he were sexually active with his girlfriend. (NT 985.) Respondent told him that he didn't have to answer the questions, but that they were important, and he had a purpose for asking the questions.

(192) Respondent then asked if Mr. AAA had ever previously testified in court, and he answered that he had not. Respondent then told him that he had some exercises that he could show him that would relax him on the witness stand and keep him focused on his testimony. (NT 986.) Since Mr. AAA didn't know what the exercises were, he didn't object. (NT 986.)

(193) Respondent told Mr. AAA that he had many clients and friends who were doctors, and he had picked up some things on the way. (NT 986.) Respondent asked Mr. AAA to assist in moving two chairs in

the office, and then requested that Mr. AAA lie down on the floor with his hands at his side and his legs together. Mr. AAA could not recall whether respondent then requested Mr. AAA to either remove his shirt or pull it up to expose his upper chest and abdomen. (NT 986-87.)

(194) Respondent straddled him, then proceeded to take a set of keys out of his pocket, and stroked the keys very lightly over Mr. AAA's collarbone, upper chest and neck, just dragging the keys, stroking him with the keys from the top of his neck to the top of his blue jeans for approximately two to three minutes. (NT 988.) Respondent asked Mr. AAA if this was relaxing. Mr. AAA lied and said yes because he thought that whatever other exercise respondent might suggest to relax him might be even worse than this one. (NT 989.)

(195) After his meeting with respondent, AAA immediately went to Officer JJJ, who had referred Mr. AAA to respondent, and complained about respondent's conduct. (NT 990.) At first, Officer JJJ thought that Mr. AAA was kidding about these allegations. Mr. AAA also told Sgt. III what had occurred. (NT 991.)

(196) Officer III believed that respondent might be involved in some child pornography. After discussing the matter with Officers JJJ and III, AAA returned to respondent's office for a second visit. (NT 991-92, 1373.) Any further questions concerning Mr. AAA's reasons for returning for a second visit were prohibited by Chairman Frommer as irrelevant. (NT 991-92.) Later, in cross-examination, Mr. AAA was asked whether he returned for a second visit to be a confidential informant for a child pornography investigation; Mr. AAA answered affirmatively. (NT 1008.)

(197) At the second visit, respondent told Mr. AAA that the hair replacement business had no medical insurance, and numerous lawsuits against the business were pending. (NT 992.) During that same visit, respondent asked Mr. AAA to do the exercises again. Respondent requested him to lie on the floor with his chest and abdomen exposed. Mr. AAA couldn't remember if respondent again straddled him or sat off to his side, but respondent began to massage his upper chest, neck, shoulders and then, each time kept going lower and lower until respondent either unbuttoned Mr. AAA's pants or asked Mr. AAA to do so. (NT 993.) Respondent kept massaging him lower until he eventually touched the top of Mr. AAA's pubic hair, about three and one-half inches from his genitals. (NT 994.) During this period of time, respondent appeared to be breathing rather heavily. (NT 994.)

(198) As soon as respondent touched Mr. AAA's pubic hair, Mr. AAA left. He immediately sought out Officers III and JJJ and told them that he would no longer be a confidential informant for them. (NT 994.)

(199) After AAA's first visit, Officer JJJ went to the district attorney's office regarding respondent's conduct toward AAA, and the district attorney said that it wasn't a crime, because Mr. AAA was an adult. (NT 1000.)

(200) Officer III contacted the FBI and the Pennsylvania Bar Association about the incidents soon after they occurred. (NT 1007.) No action was taken by either agency.

(201) Mr. AAA never went back to see respondent alone after the second appointment, but Officer JJJ spoke to respondent about these incidents. (NT 995.) Mr. AAA told Officer JJJ that he planned to sue respondent for

"everything that he was worth." (NT 1006.) He also told Officer JJJ that he was going to go to the press and media about these incidents. (NT 1007.) After speaking with Officer JJJ shortly after the incident, Officer JJJ told AAA that he had talked to respondent about the incidents and that respondent was scared. (NT 1006.)

(202) Thereafter, respondent agreed to pay AAA $2,000 as a settlement to induce Mr. AAA to take no further action. (NT 996.) AAA and Officer JJJ met with respondent. Mr. AAA signed a confidentiality agreement and release. (PE-34.) Respondent paid the $2,000 in settlement funds out of his escrow account. (NT 1838; PE-34.)

(203) On cross-examination, AAA was shown a copy of an original supplemental police report and denied having ever seen it. Respondent's counsel then asked if AAA had dummied up a police report, threatened respondent with it, and then split the $2,000 equally with Officer JJJ. AAA denied this allegation, and testified that the $2,000 went straight into his bank account and later paid for his tuition to the police academy. (NT 1065-1066.)

Testimony of III Regarding the AAA Matter:

(204) In approximately 1993, Mr. AAA complained to III about respondent's inappropriate touching, specifically that respondent had rubbed his keys on his bare chest. (NT 1372.)

(205) III then said that Mr. AAA went back to see respondent as a confidential informant. (NT 1373.) After the second appointment, Mr. AAA told III that respondent had asked him to remove his shirt, and respondent massaged Mr. AAA until he got as low as Mr. AAA's

pubic hair. (NT 1373.) III did not take a police report because it was not his jurisdiction. (NT 1376.) III stated that he had never seen the supplemental police report that was identified and showed to him as PE-33. (NT 1377.)

(206) III contacted numerous agencies including the Pennsylvania Bar Association, a U.S. Marshal who contacted the FBI about this incident, the Pennsylvania State Police and District Attorney Roy Kiefer. Essentially, these agencies advised III that respondent's conduct, even if it occurred as Mr. AAA described, did not constitute a criminal act. (NT 1374-75.)

Testimony of Respondent Regarding the AAA Matter:

(207) Respondent testified that Officer AAA is a little nuts and would take a stab at him to make himself look better as a police officer. (NT 1739.)

(208) Respondent testified that Officer AAA blackmailed him to extort money from him for police school. (NT 1619.)

(209) Respondent testified that the reason he paid Officer AAA $2000 was "Pure extortion. I was scared to death. It was blackmail. I paid it. It was the only reason I gave him the money . . . ." (NT 1636.)

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) In the matter of AA, respondent violated R.P.C. 8.4(b) by committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

(2) In the matter of AA, respondent violated R.P.C. 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

(3) In the XX matter, respondent violated R.P.C. 8.4(c) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

(4) In the matter of DD, the board concludes that petitioner did not prove its case by clear and convincing evidence, and therefore those charges against respondent are dismissed.

(5) The board concludes that petitioner did not prove its case that respondent violated R.P.C. 1.7(b), as the board does not find by clear and convincing evidence that respondent placed his sexual needs ahead of the interests of his clients.

## IV. DISCUSSION

This matter is before the Disciplinary Board on three complaints brought against respondent by petitioner, alleging that respondent engaged in inappropriate conduct with three male clients. Respondent's actions are set forth with specificity in the above findings of fact. The Hearing Committee in this matter heard testimony for nine days, producing a transcript exceeding 2,000 pages. The committee observed the testimony of 56 witnesses and admitted 130 exhibits. Subsequent to the series of hearings, the committee filed a report and recommended disbarring respondent. Respondent took exception to the committee's report and requested oral argument before a three-member panel of this board.

Respondent raised five issues at oral argument. Respondent contends that the Hearing Committee did not consider relevant the testimony of two witnesses, CCC

and DDD. These witnesses were in respondent's waiting room between 11 and noon on January 29, 2000, the day of the incident where respondent touched Mr. AA and had him ejaculate. These witnesses saw a man exit respondent's office. These witnesses testified that the man they saw did not seem upset, had a smile on his face and was laughing. The board finds no merit to this issue. Mr. AA testified that he was humiliated by the incident and, when he saw individuals in the waiting room, he did not want them to know anything had happened. The Hearing Committee did not err by dismissing the testimony of the two witnesses as not particularly relevant.

Respondent raised the issue of forcible compulsion in the AA matter and contends petitioner did not prove that the touching was against Mr. AA's will, therefore the committee erred in its conclusion that respondent committed an indecent assault on Mr. AA. The Hearing Committee thoroughly discussed this issue and, based on the facts of the matter, concluded that respondent exerted emotional and psychological force on AA, a young man who had never dealt with an attorney prior to respondent. Respondent told Mr. AA he had to trust him and Mr. AA was not allowed to tell anyone what was said in respondent's office. The board concurs with the conclusions of the committee that forcible compulsion was present and an indecent assault occurred.

Respondent contends the Hearing Committee erred by permitting 404(b) testimony as to common plan or scheme. This issue had been fully briefed and litigated before the committee at the time of the hearings. Prior to the disciplinary hearings, the committee determined that petitioner would be allowed to present such evidence subject to proper foundation at the time of testimony.

Respondent filed a petition for review of the ruling to the Disciplinary Board. The board denied respondent's petition. Petitioner presented 10 witnesses pursuant to 404(b). The committee found six to be credible. However, the committee noted in its report that it did not give much weight to these witnesses in reaching its ultimate decision, as the committee believed the pivotal testimony was that of AA, XX, DD and his mother. The board finds that the committee did not err in allowing the 404(b) testimony and, further, that the committee properly evaluated such testimony in light of the totality of the evidence presented.

Respondent contends that the Hearing Committee gave too much weight to two aggravating circumstances raised by petitioner. The committee found that respondent engaged in retaliatory conduct against Officer AAA, a 404(b) witness, by contacting Officer AAA's supervisor during the pendency of the disciplinary proceedings. The committee found this contact to be troubling. Secondly, the committee found that respondent lied when he denied various allegations of improper touching or viewing of clients, and in many instances denied anything at all occurred. The committee considered this to be a substantially aggravating factor. The board does not find this issue to have great merit. The committee based its determination that respondent was not telling the truth on the substance of respondent's testimony and its observation of respondent's demeanor on the stand. The committee determined that, not only was respondent not credible, but, in fact, he was not telling the truth in some instances. The committee viewed this as an aggravating factor. The board gives great weight and deference to the credibility determinations of the committee as fact-finder. The record

supports the committee's determination as to respondent's credibility and it will not be overturned by this board.

Lastly, respondent contends that the Hearing Committee erred in recommending disbarment. Respondent argues that the board must disregard the committee's finding of forcible compulsion and focus on the two violations of R.P.C. 8.4(c). Respondent submits that a public censure is appropriate discipline. The board finds that respondent violated 8.4(b), as well as 8.4(c), in two instances. The question of discipline will be addressed below.

This matter presents a very egregious case of an attorney who used his authority and professional position to induce his clients to take actions so that respondent could engage in sexually inappropriate behavior. The board finds that petitioner met its burden of proof by a preponderance of the evidence that was clear and convincing that respondent committed the offense of indecent assault on his client, AA, and engaged in inappropriate viewing and touching of his client XX. The board finds that petitioner did not meet its burden of proof as to DD. The record does not support a finding that inappropriate viewing or touching occurred. For that reason, the DD charge is dismissed.

The board focuses first on the AA matter. The record supports the Hearing Committee's finding that Mr. AA's testimony was credible. Respondent was retained by Mr. AA for a personal injury case. During several of the office appointments, respondent advised Mr. AA that he had to examine either his back or his lymph nodes to make sure he didn't have an infection. These examinations consisted of Mr. AA taking off his pants and re-

spondent touching his thighs or viewing his genital area. On one occasion, Mr. AA related to respondent that he had a kidney stone removed and respondent advised Mr. AA that he wanted to examine his genital area to make sure he did not have an injury from the kidney stone surgery. Mr. AA then described how respondent masturbated Mr. AA to the point of climax in respondent's office, ostensibly for the purpose of making sure that "everything worked properly."

The elements of the crime of indecent assault are satisfied when a person who has indecent contact with the complainant or causes complainant to have indecent contact with the person is guilty of indecent assault if the person does so by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution. Indecent contact is defined as "any touching of the sexual or intimate parts of a person for the purpose of arousing or gratifying sexual desire in either person." 18 Pa.C.S. §3101. Forcible compulsion is defined as "compulsion by use of physical, intellectual, moral, emotional or psychological force, whether express or implied." 18 Pa.C.S. §3101. Forcible compulsion includes not only physical force or violence, but moral, psychological or intellectual force used to compel a person to engage in contact against his or her will. *Commonwealth v. Smolko,* 446 Pa. Super. 156, 666 A.2d 672 (1995.)

There is no doubt that respondent used his position of authority as an attorney to manipulate his client Mr. AA into complying with respondent's request. Mr. AA testified that he thought respondent's questions and actions were part of his representation of Mr. AA. The board accepts this testimony as credible. The nature of the act

of masturbation of Mr. AA was done for respondent's sexual gratification and, as such, constitutes indecent contact.

In the XX matter, the board finds that Mr. XX's testimony was credible. Respondent represented his client on two criminal matters. Respondent met with Mr. XX multiple times at his office. Respondent told his client that he needed to know everything about him in order to represent him properly, and that Mr. XX needed to trust respondent and do everything he was asked. Respondent then asked his client to show him any scars. Mr. XX had a scar from a hernia operation. Respondent asked to see it. Mr. XX pulled his pants down to his knees and respondent rubbed his hand on the scar and down the inner part of his leg. Respondent's hand touched Mr. XX's testicles. In another incident, respondent made his client perform a relaxation exercise wherein Mr. XX removed an article of clothing every three minutes until he was naked. Based on the facts of record, respondent engaged in inappropriate viewing and touching of his client.

As discussed above, the testimony of 10 witnesses was permitted pursuant to Pa.R.E. 404(b). The committee found many of the witnesses to be credible, although such evidence was admitted only insofar as it tended to show a common scheme or plan. The committee noted that it did not give great weight to the testimony of these witnesses, as it viewed the heart of the case to be the AA and XX matters. The board is in agreement with the committee. The evidence of record in the AA and XX matters is clear and convincing as to respondent's dishonest and deceitful motives towards his clients, and his lack of a legitimate purpose for his acts towards his clients. His actions in these matters alone are what per-

suade the board of the extreme seriousness of his conduct and the necessity of protecting the public from further transgressions.

Respondent raised mitigating factors in his favor and had six character witnesses testify at the hearings. Respondent has had a long and successful law career in York County with no prior incidents of discipline. His witnesses testified to his pro bono service, charitable and philanthropic activities and competence, as well as his position as a provider for his family. These factors are duly noted by the board. However, in light of the seriousness of the misconduct, no amount of character testimony can serve to lessen the severity of the sanction.

The board is persuaded by the evidence of record that respondent must be disbarred. In previous Pennsylvania cases involving sexually inappropriate behavior, the discipline imposed ranged from a private reprimand to a five-year suspension. None of these cases involved such egregious contact as that which was involved in the instant case.

In the matter of *In re Anonymous No. 116 D.B. 93,* 31 D.&C.4th 199 (1995), an attorney touched the mother of his client in an offensive manner. The attorney was hired to represent the minor son in a traffic offense. While the mother of the minor was at the attorney's office to discuss the minor's case, the attorney suggested that the attorney and the mother go to lunch. While at the office, the attorney held the mother and kissed her without her consent. On the way to lunch, in the attorney's car, the attorney placed his hand on the mother's breast and made an inappropriate suggestion. The mother continued riding in the car and had lunch with the attorney. The attorney apologized the following day and returned the son's file.

No criminal charges were filed. The board imposed a private reprimand.

In the matter of *In re Anonymous No. 77 D.B. 97,* 49 D.&C.4th 119 (2000), the attorney met with a female client in his law office to discuss his representation of her in a divorce case. During the meeting, the attorney attempted to kiss the client and touched her breast while making an inappropriate suggestion. The attorney also placed the client's hand on his genital area and made another inappropriate comment. The attorney was convicted of one count of indecent assault and sentenced to two years probation. Although this incident was the only such misconduct in the attorney's 40 years of practice, the Supreme Court imposed a three-year suspension.

An attorney was suspended for five years after he engaged in inappropriate touching of clients in his office. *In re Anonymous No. 127 D.B. 94,* 64 D.B. 3 (Pa. June 2, 1998). This attorney asked three different women, either clients or married to clients, to come to his office on separate occasions, ostensibly to review legal matters. The attorney asked the women to stand in front of a wall calendar to look at dates. While the women were doing this, the attorney stood in back of them and rubbed his genital area against the women while they were fully clothed. The attorney was convicted of three counts of indecent assault and was sentenced to imprisonment of three months to 18 months and two years of probation. The attorney had no prior disciplinary or criminal history. There were several specific factors considered in this matter that led to the five-year suspension. The attorney arranged for the women to come to his law office to discuss legal matters and he arranged for them to come alone. He then used his law office to

engage in sordid and criminal behavior. The attorney abused the trust of the women who relied on him for professional services, and used his power as a licensed professional to place the women in a vulnerable position.

The men involved in this instant matter acquiesced to the activities respondent asked them to engage in because they believed respondent when he assured them that this conduct would be helpful, if not necessary, to their cases. These men trusted respondent because he was their lawyer, and, indeed, respondent informed them that they would have to have complete trust in him and do exactly what he required them to do. Respondent's actions toward his clients constitute the worst sort of abuse of authority and cannot be condoned. Respondent tricked and deceived his clients in order to sexually gratify himself. The damage respondent has caused the legal profession by his actions is immeasurable and there is no doubt that his conduct has had an adverse impact on the public trust in attorneys.

The board is cognizant that disbarment is an extreme measure to be used in only the most egregious cases, as it represents a termination of the license to practice law without a guarantee of its restoration at any future time. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). Respondent's reprehensible conduct warrants disbarment.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the respondent, Mark David Frankel, be disbarred from the practice of law in this Commonwealth.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Members Stewart and Saidis recused in this matter.

Board Members Peck and Newman did not participate in the January 14, 2004 adjudication.

## ORDER

And now, May 24, 2004, upon consideration of the report and recommendations of the Disciplinary Board dated March 12, 2004, the petition for review, the responses thereto and the request to present oral argument, the petition for review and the request to present oral argument are denied, and it is hereby ordered that Mark David Frankel be and he is disbarred from the bar of this Commonwealth, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

## ORDER

And now, May 24, 2004, the motion to partially redact and partially seal record of disciplinary proceedings is granted, and it is hereby ordered that:

(a) all transcripts and exhibits be sealed from public inspection;

(b) all pleadings, motions and briefs in these proceedings be sealed from public inspection;

(c) the Hearing Committee Report and the Disciplinary Board Report be redacted with respect to names, addresses and identifying information of petitioner's witnesses who testified in these proceedings, and such redacted reports shall be available to the public.